[No. C007190. Third Dist. Nov. 5, 1990.]

ORO FINO GOLD MINING CORPORATION, Plaintiff and Appellant, v.
COUNTY OF EL DORADO et al., Defendants and Respondents;
MOTHERLODE ALLIANCE, Real Party in Interest and Respondent.

**COUNSEL**

Douglas R. Roeca for Plaintiff and Appellant.

Bruce A. Kimzey, Deputy County Counsel, for Defendants and Respondents.

Remy & Thomas, Tina A. Thomas and James G. Moose for Real Party in Interest and Respondent.

**OPINION**

**DAVIS, J.**—Oro Fino Gold Mining Corporation (Oro) appeals from a judgment denying its petition for writ of mandate. In that petition, Oro

sought to overturn a decision of the El Dorado County Board of Supervisors (Board) denying Oro a special use permit for a mineral exploration project. In denying the permit, the Board found that it can be fairly argued that the project may have a significant environmental impact. Accordingly, the Board determined that before Oro's permit application could be reconsidered, an environmental impact report (EIR) would have to be drafted.[1]

On appeal Oro contends that both the Board and the Motherlode Alliance (MLA) are collaterally estopped from litigating the issues in this case. Oro also contends that it cannot be fairly argued on the basis of substantial evidence that the project as mitigated may have a significant environmental impact. We disagree with these contentions and shall affirm the judgment.

## BACKGROUND

In September 1987, Oro applied to the County for a special use permit for a mineral exploration project. The project entailed drilling exploratory holes on a 717-acre section in the Big Canyon Creek area. The proposed exploration area lies along the western foothills of the Sierra Nevada Mountains about 35 miles east of Sacramento, 6 miles southwest of Placerville, and just south of the community of Shingle Springs.

The project envisioned no more than 30 holes, each of which was to be no larger than 7 inches in diameter and 2,000 feet deep. The drilling methods were diamond core, rotary and percussion. No blasting was proposed.

Actual drilling was limited to two sites in the seven hundred and seventeen-acre section, each approximately one acre. These sites were located in the northern and southern portions of the 717-acre section. Numerous single family homes and small structures bordered or were near the northern drill site.

About four years before the Oro proposal was considered, the Gold Fields Mining Corporation (Gold Fields) had conducted a similar mineral exploratory drilling project based on a special use permit. That permit was granted by a deeply divided Board based upon a mitigated negative declaration subject to 37 conditions. The conditions concerned groundwater and surface water quality, air quality, noise, reclamation, erosion, fire danger, and toxic substances. The Gold Fields permit allowed the drilling of up to 300 holes in the same dimensions as the Oro application. Gold Fields,

---

[1] Oro sued El Dorado County, its board of supervisors and its planning commission. Where appropriate, we will refer collectively to these entities simply as the County. Also named in Oro's suit—as the real party in interest—was the Motherlode Alliance.

however, drilled only 34 holes. In contrast to Oro's proposed drilling, Gold Fields drilled in a number of areas across much of the 717-acre parcel.

In considering the Oro application, the County planning department staff prepared an environmental initial study in November 1987. Twenty-one potential environmental impacts were identified. These impacts included soil erosion, air deterioration, groundwater quality, well water depletion, wildlife habitat deterioration, increase in ambient noise and exposure to severe noise levels, fire danger, and increased motor traffic. The planning department staff recommended granting Oro's permit application subject to a mitigated negative declaration incorporating a set of conditions similar to the Gold Fields project. The staff determined that "although [Oro's] proposed project could have a significant effect on the environment, there [would] not be a significant effect in this case" because of the mitigation measures.

In January and February of 1988 the planning commission (Commission) heard Oro's permit application. The Commission unanimously rejected the staff recommendation of a mitigated negative declaration. Finding the environmental documentation inadequate, the Commission—again unanimously—determined that any further consideration of the application required that an EIR be prepared. The report was to focus on "water quality, noise, dust, lights, traffic and toxic/solid waste." On this basis the Commission denied the application without prejudice.

Oro appealed the Commission's decision to the Board, basically contending there was no evidence before the Commission to require an EIR. Over a period of two days in March 1988, the Board heard the appeal essentially de novo. Both Oro and the project's opponents presented documentary evidence and testimony at the hearing. The Board unanimously denied the permit application, finding that the project's opponents had made a fair argument that the project may have a significant environmental impact. The Board determined that an EIR should be prepared addressing (1) the concerns raised by the citizens in the area, (2) a "no project alternative" in light of the Gold Fields's core samples, and (3) the land use conflicts between the proposed project and the existing and planned uses in the area. Both the Commission and the Board heard substantial testimony in opposition to the project from members of the public. No less than 50 letters opposing the project—often signed by multiple parties—were also sent to County officials.

Oro petitioned the superior court for a writ of mandate to set aside the Board decision and to order the permit application approved under the

mitigated negative declaration recommended by planning staff. In June 1989 the court denied the petition. The court found there was substantial evidence to support the Board's determination that a fair argument can be made that the project may cause a significant environmental effect.

## DISCUSSION

### I

We first consider Oro's contention that the County and MLA are collaterally estopped from litigating the issues in this case.

When the Board in early 1984 approved the Gold Fields special use permit upon a mitigated negative declaration, MLA unsuccessfully petitioned for a writ of mandate to overturn that decision. (Motherlode Alliance v. County of El Dorado, Gold Fields (Super. Ct. El Dorado County, 1984, No. 43082).)[2]

■ Collateral estoppel can be invoked against a party to a prior action by a nonparty if three conditions are met: (1) the issue in the prior action and the current action is identical; (2) there was a final judgment on the merits in the prior action; and (3) the party being collaterally estopped was a party, or in privity with a party, in the prior action. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 811-813 [122 P.2d 892].)

■ Oro asserts the issue in the Gold Fields litigation was whether a fair argument had been made that an EIR was warranted. Oro argues the identical issue is posed in this case, and both the MLA and the County were parties to the Gold Fields case in which a final judgment was rendered. Consequently, Oro argues, it is entitled to proceed—as did Gold Fields—on a mitigated negative declaration.

This argument's success depends ultimately upon the similarity between the Oro and the Gold Fields drilling projects. Oro recognizes this point. In fact, Oro argues that its project is the same as the Gold Fields project except its project has less environmental impact. The Gold Fields permit allowed up to 300 holes and 8 drilling rigs. In contrast, the Oro permit allows a maximum of only 30 holes and 4 drilling rigs.

This argument has a certain appeal on its surface. However, we are sure Oro will understand if we dig a bit deeper. In doing that, we find there are a

---

[2] The No. 43082 action was judicially noticed in the present action by the trial court.

number of material distinctions between the Oro and the Gold Fields drilling projects.

First, there are the drilling sites. Gold Fields drilled in many areas across the 717-acre Oro section. In contrast, Oro plans to drill in just two small areas—each about one acre in size—in the northern and southern portions of the section. Gold Fields drilled about seven holes in that northern portion but no holes in Oro's proposed southern site. In fact, Gold Fields could not drill in that southern site because the site is situated within 103 acres not in the Gold Fields project. The northern site is the critical one because many residences are located nearby. Gold Fields drilled primarily in the eastern and southern portions of the 717-acre section, away from residential development. Maps submitted with Oro's permit application indicate the northern site will be Oro's focus. Consequently, Oro's drilling plans are significantly more concentrated—both in area and in residential impact—than the Gold Fields project.

The preceding facts take on an added significance given the substantial population growth in the Shingle Springs area since the Gold Fields project ended (about six years ago). This additional population also implicates concerns regarding traffic congestion and safety, groundwater quantity and quality, noise, and fire danger.

Another important difference between the Oro and the Gold Fields projects is drilling methods. Permit applications for both projects listed those methods as diamond core, rotary and percussion. While Gold Fields evidently did not engage in percussion drilling, there is evidence from Oro's geologist and from the planning department staff that Oro intends to use the percussion technique to drill larger holes than Gold Fields drilled. Oro attempts to disclaim this, relying on an environmental assessment form that does not list the percussion method. However, in Oro's permit application and in all of the project descriptions before the pertinent authorities, the percussion method is listed. The percussion method is an important factor because apparently it is the noisiest drilling method.

A condition attached to the Gold Fields project but not to the Oro project highlights the distinction between the two. Gold Fields could not drill "closer than 500 feet from the north boundary of the project property, and in no case . . . closer than 500 feet from the nearest residences which are not within the project property." That condition was not made a part of the proposed mitigated negative declaration for Oro. There is evidence that Oro's proposed northern drill site is within 500 feet of certain residences.

These distinctions render the doctrine of collateral estoppel inapplicable under the "identical issue" requirement of *Bernhard.* (19 Cal.2d at p. 813.)

## II

We now consider Oro's claim that it cannot be fairly argued on the basis of substantial evidence that Oro's mitigated project may have a significant environmental impact.

The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq., § 21050)[3] requires government agencies to prepare or contract to prepare an EIR for any project they carry out or approve which "may have a significant effect on the environment." (§ 21151; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 999 [165 Cal.Rptr. 514].) ■ According to our Supreme Court, "the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; see also *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) ■ Since the preparation of an EIR is the key to environmental protection under CEQA—indeed constituting the very heart of the CEQA scheme—accomplishment of CEQA's high objectives requires the preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75, 84 [118 Cal.Rptr. 34, 529 P.2d 66]; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 304 [248 Cal.Rptr. 352].)

Accordingly, the critical question for us is whether there is substantial evidence in light of the whole record to support the Board's determination that it can be fairly argued that Oro's project may have a significant environmental impact. As explained in *Friends of "B" Street*: "If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it could be 'fairly argued' that the project might have a significant environmental impact." (106 Cal.App.3d at p. 1002; *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 747-748 [198 Cal.Rptr. 100]; *City of Antioch* v. *City Council* (1986) 187

---

[3] Further statutory references to sections of an undesignated code are to the Public Resources Code.

Cal.App.3d 1325, 1331 [232 Cal.Rptr. 507]; § 21168; El Dorado County Code, § 17.22.040.) Consequently, there is "a low threshold requirement for preparation of an EIR." (*No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at p. 84; *Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at pp. 309-310.)[4]

 CEQA establishes specific procedures governing the preparation of an EIR. If the project is in one of CEQA's exempted categories or if it is certain not to have an environmental effect, "no further agency evaluation is required." (*Friends of "B" Street, supra*, 106 Cal.App.3d at pp. 999-1000.) If the project is not exempt and if "there is a possibility that the project may have a significant environmental effect, the agency must conduct an initial threshold study. [Citation] If the initial study reveals that the project will not have such effect, the . . . agency may complete a negative declaration . . . ." (*Id.* at p. 1000.) If the initial study reveals the project "may" have a significant environmental effect, an EIR must be prepared; the word "may" connotes a reasonable possibility. (*Ibid.*; *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at pp. 74, 83, fn. 16; *Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 309.) A "significant effect on the environment" is defined as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15382 (hereafter Guidelines); see also § 21068.)

We now apply these principles to the facts of this case. We first consider the mitigated project's impact on noise levels.

Oro relies on an acoustical analysis of the Gold Fields project and argues simply that the proposed mitigated negative declaration prohibits noise levels above the applicable county general plan noise standard maximum of 50 dBA (decibel A-weighted). Accordingly, Oro asserts there is no issue regarding noise.

 Initially, we note that conformity with a general plan does not insulate a project from EIR review where it can be fairly argued that the

[4] As noted by this court in *Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424, 433-434, footnote 4 [187 Cal.Rptr. 53], there was some question about the proper standard of review as articulated in the conflicting cases of *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 558 [140 Cal.Rptr. 812] and *Friends of "B" Street, supra*, 106 Cal.App.3d at pages 1001-1002. This is no longer true. The district and division that decided *Pacific Water Conditioning Assn., Inc.* adopted the *Friends of "B" Street* standard in *Newberry*. (150 Cal.App.3d at pp. 747-748.)

project will generate significant environmental effects. (*City of Antioch* v. *City Council, supra*, 187 Cal.App.3d at p. 1332.)

The acoustical analysis on the Gold Fields project involved a single diamond core drilling rig with a standard muffler. At 50 feet the rig emitted 83 dBA. The standard practice in noise analyses is to use the "inverse-square" rule of sound propogation, which is quite accurate within 1,000 feet of the noise source. This rule posits a 6 dBA noise reduction for each doubling of distance between source and receiver. Using the Gold Fields analysis—upon which Oro relies—we find that 65 dBA are emitted at 400 feet from the source and 59 dBA at 800 feet. In fact, at nearly a third of a mile away (1,600 feet) the applicable maximum noise standard is still being exceeded at 53 dBA. There are a number of residences within these distances to Oro's proposed northern drill site. Furthermore, there is substantial evidence that Oro intends to use percussion drilling, a noisier method than diamond core drilling. And Oro, unlike Gold Fields, is concentrating its drilling on two small sites.

Oro maintains, however, that under the proposed mitigated negative declaration its drilling noise simply cannot exceed the county standard of 50 dBA measured from a point which is 50 feet from the residence in question. Based on planning department data, Oro argues that only two noise complaints were made on the Gold Fields project and "worse case" analyses of those complaints indicated noise standards were not exceeded. These arguments would carry weight if the evidence showed the noise standards were monitored and enforced vigorously. But numerous residents testified at the Commission and the Board hearings that they made multiple complaints to pertinent county officials about the noise from the Gold Fields project. Other residents echoed this testimony in letters to the Commission and the Board. ■■ Relevant personal observations such as these can constitute substantial evidence. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 173 [217 Cal.Rptr. 893]; cf. *Perley* v. *Board of Supervisors, supra*, 137 Cal.App.3d at pp. 433-437.) The Board—and not this court—determines the weight of this evidence. (*Citizens Assn. for Sensible Development of Bishop Area, supra*; *Newberry Springs Water Assn.* v. *County of San Bernardino, supra*, 150 Cal.App.3d at p. 750.)

Oro's traffic expert concluded the project would not have a significant impact on traffic given the mitigation measures of avoiding commute and school bus schedules and moving large equipment with pilot car accompaniment. That conclusion rested in part on the limited duration of the typical exploratory mining project. However, the mitigated negative declaration

allowed Oro a three-year project. Moreover, numerous area residents provided evidence of increased traffic and traffic mishaps. Much of the testimony noted that the roads in the area were few, mountainous and narrow. The rapid population growth in recent years, especially among school-age children, was also noted. Again, these were matters within the personal knowledge of the area's residents and constituted evidence for the Board's consideration. (*Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d at p. 173.)

As envisioned throughout the permit application process, the Oro project would use 2,000 gallons of water per day to be drawn from a well on project property and from an old mine (Big Canyon Mine). Near the end of the final day of Board hearings on the application, however, the Oro representative for the first time stated that Oro no longer had the rights to the well on the project property and would be drawing all needed water from the Big Canyon Mine. Nothing further was stated about this change. The proposed mitigated negative declaration was drafted when the well was a water source. A substantial water source is a critical element in the drilling process.

Furthermore, there was substantial concern about groundwater contamination. The residents near the northern drilling site use well water. While mere concern does not constitute admissible evidence (see *Perley* v. *Board of Supervisors, supra,* 137 Cal.App.3d at pp. 433-437), there were some factors the Board could consider. The Oro project encompassed more drilling near residential development than the Gold Fields project. There was evidence Oro planned to drill larger holes than Gold Fields drilled. The typical exploratory mineral drill hole is much deeper than the typical water well. Oro could drill to 2,000 feet pursuant to the mitigated negative declaration. A Board supervisor with knowledge about the relationship between drilling and groundwater contamination, Supervisor Dorr, noted on the record that drilling creates pathways for contaminants to travel to aquifers. Groundwater conditions under the Oro drill sites are unknown. A Board supervisor with drilling experience, Supervisor Sweeney, found it incredulous that there were no boring logs from the Gold Fields project to indicate whether Gold Fields had encountered aquifers during its drilling. Gold Fields did not do any groundwater studies or monitoring and had not been directed to do so.

Oro's proposed drilling project constitutes a "surface mining operation" under the Surface Mining and Reclamation Act (§ 2710 et seq.). As such, the project requires a reclamation plan. (§ 2735, subd. (c).) Oro submitted such a plan with its permit application. Three months later, the planning

staff, in its proposed mitigated negative declaration, required that a reclamation plan be *submitted*. Interestingly, the planning staff noted in Gold Fields's mitigated negative declaration that Gold Fields had prepared and submitted such a plan as part of its application. Evidently, Oro's plan was inadequate. Similarly, the mitigated negative declaration required the *development* of a dust plan and a fire plan.

The El Dorado County Resource Conservation District characterized the erosion hazards of the Oro project as "moderate to high." Although the actual drill sites are small in area, access to the sites requires road construction. Oro submitted a very general erosion control plan to the County as part of its reclamation plan. This prompted the planning staff in the mitigated negative declaration to require that an erosion plan be *established*.

Most of the factors discussed above highlight the fundamental problem here. That is the problem of land use conflict. The Board recognized this point and required it to be analyzed in any EIR prepared for the project. This conflict is inevitable when rapid population growth occurs, as here, in foothill areas that lure miners in search of gold. Throughout its arguments, Oro attempts to dismiss the severity of this conflict by relying on the County planning director's statement at the Board hearing that neither the planning department nor the environmental health department was made aware of any problems associated with the Gold Fields activity. Of course, the statement ignores the fact that noise complaints were made. But more important is the overwhelming public opposition to the Oro project. This opposition was engendered in large part from the experience of the Gold Fields project. The public's concern about Oro's project therefore was not merely subjective speculation. (Cf. *Perley* v. *Board of Supervisors, supra*, 137 Cal.App.3d at pp. 433-437.) Also throughout its arguments, Oro asserts its project is simply a scaled-down—and therefore less harmful—version of the Gold Fields project. The fallacy of this position has been demonstrated in Discussion section I of this opinion.

Another major problem concerns the mitigation measures that call for the reclamation, erosion, dust and fire plans to be formulated *after* the mitigated negative declaration is approved. ■■ There cannot be meaningful scrutiny of a mitigated negative declaration when the mitigation measures are not set forth at the time of project approval. Much of the analysis in *Sundstrom* hinged on this point. (202 Cal.App.3d at pp. 306-309.) In that case, the court noted that public scrutiny is an integral component of the CEQA scheme. (*Id.* at pp. 306-307.)

Of course, these mitigation deficiencies do not necessarily mandate the preparation of an EIR. Obviously, the mitigation measures can be modified

to ensure meaningful review. But the reclamation and erosion plans submitted with Oro's permit application are evidently inadequate. And we have seen there is troubling information regarding noise levels, insufficient information concerning water sources, and perhaps a fundamental misconception in the traffic study. As stated in *No Oil* and echoed in *Sundstrom*: " 'One of the purposes of the [EIR] is to insure that the relevant environmental data are before the agency and considered by it prior to the decision to commit . . . resources to the project . . . .' " (*No Oil, supra*, 13 Cal.3d at p. 84, quoting from *Hanly* v. *Kleindienst* (2d Cir. 1972) 471 F.2d 823, 837-838 (dis. opn. of Friendly, J.); *Sundstrom, supra*, 202 Cal.App.3d at pp. 308-309.) In short, in the absence of overriding circumstances, the CEQA process demands that mitigation measures timely be set forth, that environmental information be complete and relevant, and that environmental decisions be made in an accountable arena. (*Sundstrom, supra*, at pp. 306-309.) The mitigated negative declaration for the Oro project did not satisfy these principles and could not satisfy them on the existing information base.

There is substantial evidence supporting the Board's determination that it can be fairly argued that the Oro project may have a significant environmental impact.[5]

The judgment is affirmed. Respondents are awarded their costs.

Marler, Acting P. J., and Scotland, J., concurred.

---

[5]This disposition renders unnecessary any reliance on Guideline section 15064, subdivision (h)(1). That section provides that in cases where it is not clear whether there is such substantial evidence, if there is serious public controversy over the environmental effects of a project, the agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR. There certainly was serious public controversy over many environmental effects of the Oro project. However, Code section 21082.2, subdivision (a), drafted after Guideline section 15064, states the matter somewhat differently: ". . . The existence of public controversy over the environmental effects of a project shall not require preparation of an [EIR] if there is no substantial evidence before the agency that the project may have a significant effect on the environment."