[No. B174453. Second Dist., Div. Three. May 27, 2005.]

MARIA MEJIA, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent;
CALIFORNIA HOME DEVELOPMENT, LLC, Real Party in Interest and
Respondent.

COUNSEL

Maria Mejia, in pro. per., for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Susan D. Pfann and Jack L. Brown, Assistant City Attorneys, for Defendant and Respondent.

Law Offices of L. Douglas Brown and L. Douglas Brown for Real Party in Interest and Respondent.

OPINION

**CROSKEY, J.**—Maria Mejia challenges the approval by the City of Los Angeles of a residential development project in the Sunland area and the city's adoption of a mitigated negative declaration under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). She appeals a judgment denying her petition for writ of mandate, arguing several grounds for error. We conclude that substantial evidence supports a fair argument that the project will have significant, unmitigated environmental

impacts on animal wildlife and traffic, so a mitigated negative declaration was improper. We therefore reverse the judgment with directions to the superior court to grant the petition and issue a writ of mandate ordering the city to vacate its project approval and mitigated negative declaration and to cause an environmental impact report (EIR) to be prepared.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Application for a Tentative Tract Map and Project Approval

California Home Development, LLC (California Home), applied to the city in June 1999 for approval of a tentative tract map to subdivide 17 acres of land along Wheatland Avenue in the Shadow Hills community. The property consists of rolling hills and flat land, is predominantly undeveloped, and is surrounded by single-family residential homes on large lots with equine appurtenances. The city previously approved a project involving the construction of 28 single-family homes on the site in June 1990, but the homes were never built. California Home's application in June 1999 stated that the new proposed project was the "same project" as the one previously approved.

The city's advisory agency conducted a public hearing on the application, and in December 1999 approved the tentative tract for development of 28 single-family homes subject to conditions, and approved a mitigated negative declaration. A group of homeowners appealed the decision to the city planning commission. The city planning commission reduced the approved number of homes to 23 and revised the conditions. The Planning and Land Use Management Committee affirmed the decision by the planning commission. The city council approved the project in June 2000 and adopted a mitigated negative declaration.[1]

### 2. Set Aside of the Project Approval

Mejia filed a petition for writ of mandate in the superior court challenging the project approval under CEQA. The court granted the petition in July 2001 and set aside the project approval. The judgment stated that the court granted the petition because the city "failed to give proper notice of the City's intent

---

[1] The principal documents reflecting these events should have been but were not included in the administrative record in this proceeding, as discussed *post.* (Pub. Resources Code, § 21167.6, subd. (e).)

to adopt a Mitigated Negative Declaration," and ordered the city to "proceed with a properly noticed hearing" on the application for a tentative tract map.

### 3. *Further Proceedings and Project Approval*

The city planning department prepared an initial study and proposed mitigated negative declaration in September 2001. The initial study determined that the project would have several potentially significant environmental impacts, but found that the impacts could be mitigated. The advisory agency conducted a public hearing on the application in March 2002. Several neighborhood residents expressed concerns and opposition in writing, and some did so orally at the hearing. The advisory agency concluded at the end of the hearing that the planning department should reconsider the potential environmental impacts, including "height, construction hours, loss of wildlife, speeding on Wheatland, problems with picking up trash and going along Wheatland . . . drainage, grading," that California Homes should provide an updated tree report, and that the city department of transportation should "take another look at the traffic generation from the 23-lot development."

The planning department prepared a new initial study and proposed mitigated negative declaration in May 2002. The planning department prepared another initial study and proposed mitigated negative declaration in September 2002 reflecting a reduction in the number of homes from 23 to 21. The initial study determined that the project would have several potentially significant environmental impacts, but found that the impacts could be mitigated. The planning department gave public notice of its intent to adopt a mitigated negative declaration, stating that it would receive comments on the proposal for 30 days, until October 21, 2002. The planning department did not notify the Department of Fish and Game of its intent to adopt a mitigated negative declaration. The advisory agency conducted another public hearing on October 24, 2002. Several neighborhood residents expressed concerns and opposition in writing, and some did so orally at the hearing. The advisory agency concluded at the end of the hearing that the mitigated negative declaration should be approved with two modified conditions. The advisory agency formally approved the tentative tract and mitigated negative declaration with conditions in November 2002.

Several residents, including Mejia, appealed the decision to the planning commission. The planning commission conducted a public hearing in December 2002 and approved the tentative tract and mitigated negative declaration. The Planning and Land Use Management Committee conducted a public hearing on two days in February 2003 and approved the tentative tract and mitigated negative declaration with 10 additional conditions. The city council

approved the tentative tract in February 2003 and adopted the mitigated negative declaration.

### 4. *Trial Court Proceedings*

Mejia filed a petition for writ of mandate in the superior court challenging the project approval under CEQA and on other grounds. The city prepared an administrative record. Mejia requested judicial notice of numerous documents not included in the administrative record. She made several arguments in support of the petition, including the argument that the mitigated negative declaration was improper because the project may have significant impacts on wildlife and traffic despite the mitigation. After a hearing on the merits, the court issued a minute order granting judicial notice of two documents and denying the petition. The court entered a judgment denying the petition in February 2004.

## CONTENTIONS

Mejia contends (1) the project may have significant, unmitigated impacts on animal wildlife, traffic, planning and land use, and cumulative impacts, so a mitigated negative declaration was improper; (2) a mitigated negative declaration was improper because California Home agreed to mitigation measures after the public release of a proposed mitigated negative declaration, rather than before; (3) the city failed to notify the California Department of Fish and Game of its intention to adopt a mitigated negative declaration, as required; (4) the city failed to make all pertinent documents available for review during the public comment period; (5) the city's planning department failed to consider some public comments; (6) the project is inconsistent with the community plan; (7) the tentative tract map fails to disclose private easements, as required by the Los Angeles Municipal Code; and (8) the administrative record prepared by the city in connection with this litigation is incomplete.

## DISCUSSION

### 1. *CEQA Requirements*

■ "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to

be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

■ An EIR is required for any project that a public agency proposes to carry out or approve that may have a significant effect on the environment. (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a); Guidelines,[2] § 15064, subd. (a)(1).) ■ An EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (Pub. Resources Code, §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.) "The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project can be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.)

"We have repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." [Citations.]' To this end, public participation is an 'essential part of the CEQA process.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

■ A negative declaration is a written statement that briefly explains why a project will not have a significant environmental impact and therefore will not require an EIR. (Pub. Resources Code, § 21064.) A negative declaration is proper only if the agency determines based on an initial study that there is no substantial evidence that the project may have a significant effect on the environment. (Pub. Resources Code, § 21080, subds. (c)(1), (d); Guidelines, §§ 15063, subd. (b)(2), 15070, subd. (a).) If an initial study shows that the

---

[2] All references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) developed by the Office of Planning and Research and adopted by the California Resources Agency. (Pub. Resources Code, §§ 21083, 21087.) "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

project may have a significant effect on the environment, a *mitigated* negative declaration may be appropriate. A mitigated negative declaration is proper, however, only if project revisions would avoid or mitigate the potentially significant effects identified in an initial study "to a point where clearly no significant effect on the environment would occur, and . . . there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Pub. Resources Code, § 21064.5; accord, § 21080, subd. (c)(2).)

■ " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.) The Guidelines define "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant."[3] (Guidelines, § 15382.) A project " 'may' " have a significant effect on the environment if there is a " 'reasonable probability' " that the project will have a significant environmental impact. (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 83, fn. 16 [118 Cal.Rptr. 34, 529 P.2d 66].) "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b).)

"Substantial evidence" under CEQA "includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1).) "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the

---

[3] " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. The area involved shall be the area in which significant effects would occur either directly or indirectly as a result of the project. The 'environment' includes both natural and man-made conditions." (Guidelines, § 15360; see Pub. Resources Code, § 21060.5.)

environment." (*Id.*, § 21080, subd. (e)(2); accord, *id.*, § 21082.2, subd. (c).) The Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (*Id.*, § 15384, subd. (b); accord, *id.*, § 15064, subd. (f)(5).)

■ These legal standards reflect a preference for requiring an EIR to be prepared. "There is 'a low threshold requirement for preparation of an EIR' (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84 [118 Cal.Rptr. 34, 529 P.2d 66]), and a 'preference for resolving doubts in favor of environmental review' (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316–1317 [8 Cal.Rptr.2d 473]). An EIR must be prepared 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact' (*No Oil, Inc., supra,* at p. 75 [118 Cal.Rptr. 34, 529 P.2d 66]), even if there is substantial evidence to the contrary (*Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1346 [125 Cal.Rptr.2d 140]; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514])." (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 580–581 [18 Cal.Rptr.3d 814]; see Guidelines, § 15064, subd. (f).)

■ "Application of the 'fair argument' test is a question of law for our independent review. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 617 [49 Cal.Rptr.2d 494]; *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602 [35 Cal.Rptr.2d 470].) We review the trial court's findings and conclusions de novo (*Arviv Enterprises, Inc. v. South Valley Area Planning Com., supra,* 101 Cal.App.4th at p. 1346 [125 Cal.Rptr.2d 140]), and do not defer to the agency's determination (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1318 [8 Cal.Rptr.2d 473]), except on 'legitimate, disputed issues of credibility' (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* at p. 1603 [35 Cal.Rptr.2d 470];

Leonoff v. Monterey County Bd. of Supervisors (1990) 222 Cal.App.3d 1337, 1349 [272 Cal.Rptr. 372]).'' (Bowman v. City of Berkeley, supra, 122 Cal.App.4th at pp. 580–581.) "Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. [Citation.]" (Sierra Club v. County of Sonoma, supra, 6 Cal.App.4th at pp. 1317–1318.)

### 2. The Administrative Record Is Incomplete

■ The petitioner in a CEQA proceeding may file a request for the public agency to "prepare the record of proceedings relating to the subject of the action or proceeding." (Pub. Resources Code, § 21167.6, subd. (a).) The public agency must prepare and certify the record of proceedings within 60 days after service of a request. (Id., § 21167.6, subd. (b)(1).) The record of proceedings includes a broad range of documents pertaining to the project.

Public Resources Code section 21167.6, subdivision (e), states, "The record of proceedings shall include, but is not limited to, all of the following items:

"(1) All project application materials.

"(2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project.

"(3) All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division.

"(4) Any transcript or minutes of the proceedings at which the decision-making body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project.

"(5) All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project.

"(6) All written comments received in response to, or in connection with, environmental documents prepared for the project, including responses to the notice of preparation.

"(7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project.

"(8) Any proposed decisions or findings submitted to the decisionmaking body of the respondent public agency by its staff, or the project proponent, project opponents, or other persons.

"(9) The documentation of the final public agency decision, including the final environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3), cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division.

"(10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division.

"(11) The full written record before any inferior administrative decision-making body whose decision was appealed to a superior administrative decisionmaking body prior to the filing of litigation."

■ The "project" referenced in Public Resources Code section 21167, subdivision (e), includes not only the final version of the project approved by the public agency, but also prior versions of the project constituting substantially the same overall activity. (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 9–10 [6 Cal.Rptr.3d 286].)

The earliest documents chronologically in the administrative record prepared by the city are a tentative decision dated June 15, 2001, by the superior court in the prior proceeding initiated by Mejia, and a judgment and writ of

mandate dated July 5, 2001, setting aside the city's approval of the tentative tract map and directing the city to give proper notice of its intention to adopt a mitigated negative declaration. All other documents in the administrative record, apart from historical maps, postdate the judgment in the prior proceeding. The city certified that the administrative record includes all the documents in specified files maintained by the city. The city apparently maintains separate files for the project before and after the judgment in the prior proceeding and considers matters concerning the project before the prior judgment as water under the bridge.

The administrative record prepared by the city is incomplete because it excludes documents pertaining to the project that antedate the judgment in the prior proceeding, including project application materials, staff reports, correspondence, environmental studies, and other documents listed in Public Resources Code section 21167.6, subdivision (e), pertaining to prior versions of substantially the same project. We cannot accurately describe the documents missing from the administrative record because most of those documents are not included in the appellate record. Some of the missing documents were the subject of Mejia's request for judicial notice in the superior court. The superior court apparently construed the request as a motion to supplement the administrative record and granted the motion as to only two documents.

We conclude that the court should have granted the motion as to other documents as well. For purposes of our review, we need address only the project application submitted in June 1999 (see Pub. Resources Code, § 21167.6, subd. (e)(1)), a biotic assessment dated December 1989, and the advisory agency's approval in June 1990 of a prior project on the same site.[4] The biotic assessment was prepared in connection with the project approved in June 1990. Both that prior project and the project proposed by California Home in June 1999 involved the development of 28 single-family homes, and the application submitted by California Home in June 1999 stated that the proposed project was the "same project" as the one approved in June 1990 but never completed. These documents show that the project approved in June 1990 was a prior version of the project approved in February 2003 and that the projects were substantially the same for purposes of Public Resources Code section 21167.6, subdivision (e). We therefore conclude that the biotic

---

[4] The biotic assessment was included in the administrative record for the prior proceeding initiated by Mejia, but the city did not include the document in the administrative record for the present proceeding. We take judicial notice of the index of the administrative record in the prior proceeding, as requested by the Mejia in the trial court.

assessment is a mandatory part of the record of proceedings under items (3) and (7) of subdivision (e). Specifically, the biotic assessment is a document submitted to the city relevant to its finding that there will be no impact on animal wildlife (item (3)) and is written evidence submitted to the city concerning compliance with CEQA with respect to the project (item (7)).

We reject the argument by California Home that Mejia cannot challenge the adequacy of the administrative record on appeal because she failed to file a noticed motion to supplement the administrative record pursuant to rule 9.24(f) of the Local Rules of the Los Angeles Superior Court.[5] Mejia's request for judicial notice was the practical equivalent of such a motion. Mejia filed and served the request together with her opening memorandum of points and authorities in support of the petition several weeks before the hearing on the petition, California Home and the city filed a joint objection to the request more than two weeks before the hearing, and California Home and the city were in no way prejudiced by Mejia's failure to properly label her motion.

### 3. A Fair Argument, Based on Substantial Evidence, Can Be Made That the Project May Have a Significant Impact on Animal Wildlife

The biotic assessment prepared in December 1989 described the property as "relatively rich in animal life. There were a number of bird species observed that are wintering in the area (flocks of waxwings, yellow-rumped warblers, white-crowned sparrows, and robins). In addition, a red-tailed hawk was seen roosting in the tall trees on the top of the small hill on the property, and barn owl signs (pellets) were quite common on the northern part of the parcel. This northern area also appears to offer a minor movement corridor to the carnivores of the area . . . ." It stated further, "It is likely that a number of other species use the property. Weather conditions and time of year influence the activity, presence, and visibility of vertebrate species. A late spring/early

---

[5] "Once the administrative record has been filed, any disputes about its accuracy or scope should be resolved by appropriate notice[d] motion. For example, if the agency has prepared the administrative record, petitioners may contend that it omits important documents or that it contains inappropriate documents; if the petitioners have prepared the record, the agency may have similar contentions. A motion to supplement the certified administrative record with additional documents and/or to exclude certain documents from the record may be noticed by any party and should normally be filed concurrently with the filing of petitioner's opening memorandum of points and authorities in support of the writ. Opposition and reply memoranda on the motion should normally be filed with the opposition and [reply] memoranda, respectively, regarding the writ. The motion should normally be calendared for hearing concurrently with the hearing on the writ." (Super. Ct. L.A. County, Local Rules, rule 9.24(f).)

summer study would not only record residents on the property, but bird species that only nest in the area and reptile/amphibian species active on the surface. . . . [¶] No threatened or endangered species of animals were observed on the parcel and, given the location and the small size of the parcel, none are expected to use the property for any significant amount of their yearly needs. . . . [¶] One should expect that any urbanization on the site will have negative impacts on most animal numbers . . . . The small mammal movement corridor on the northern edge of the property would be eliminated."

The biotic assessment included a list of animal species observed on the property or expected to be present. The list included two bird species currently identified by the Department of Fish and Game as species of special concern: Cooper's hawk and loggerhead shrike.[6] The biotic assessment also stated that the Pacific kangaroo rat was expected to be present on the property, although it also stated that the "high incidence of kangaroo rats" found in barn owl pellets indicated that "the barn owls must be hunting these prey items off the property, but close to their roosting trees."[7]

The initial study prepared in September 2002 stated that the property "contains approximately 340 trees, mostly ornamental, non-protected species." The initial study stated that the project would have no impact on animal wildlife and that the cumulative impact on animal wildlife would be less than significant. In response to each question on the initial study checklist concerning animal wildlife, apart from cumulative impacts, the "No Impact" box was checked.[8] The questions included whether the project would "[h]ave a substantial adverse effect . . . on any species identified as a

---

[6] The Department of Fish and Game maintains lists of species of special concern on its website, stating, " 'Species of Special Concern' (SSC) status applies to animals not listed under the federal Endangered Species Act or the California Endangered Species Act, but which nonetheless 1) are declining at a rate that could result in listing, or 2) historically occurred in low numbers and known threats to their persistence currently exist." (<http://www.dfg.ca.gov/hcpb/species/ssc/ssc.shtml> [as of May 27, 2005].)

[7] Unlike several other varieties of kangaroo rat, the Pacific kangaroo rat is not designated as endangered, threatened, or a species of special concern.

[8] The responses in the initial study of May 2002 were identical to those in the initial study of September 2002. The initial study of September 2001, however, stated that the impacts on animal wildlife would be "Less Than Significant," rather than "No Impact," and that the cumulative impact would be "Potentially Significant Unless Mitigation Incorporated," rather than "Less Than Significant." Thus, in response to the concerns expressed regarding the project after the initial study of September 2001, the city revised the initial study by downgrading the stated impacts on animal wildlife, but apparently did not substantially revise the project other than by reducing the number of homes from 23 to 21.

candidate, sensitive, or special status species," "interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors," or "have the potential to degrade the quality of the environment, substantially reduce the habitat of fish or wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, reduce the number or restrict the range of a rare or endangered plant or animal . . . ."[9]

The explanations provided in the initial study for the "No Impact" responses stated: "The site is in close proximity to the Angeles National Forest, Hansen Dam Recreation Area, Big Tujunga Wash, and Verdugo Mountains. [¶] The subject site is surrounded by developed properties to the north, south, east, and west. The site itself is not physically linked to any of the above areas. Due to the surrounding developments, it is reasonable to conclude that the subject site does not constitute appropriate or adequate habitat to support significant, endangered, or threatened species of plants or animals. Furthermore, the subject site has not been identified as having significant habitat for threatened, endangered, or sensitive wildlife, fish, or plant species in any official record." "Project implementation will not interfere with the movement of any native resident wildlife species; the subject site is surrounded by significant developments. No significant fish or wildlife species are known to use this site as part of a migratory path. Development of this site will not impede the movement of any wildlife species. [¶] Several trees will remain on site and any living tree removals will be replanted. Therefore, any potential impact to a bird habitat is less than significant. [¶] Based on the location, surrounding development, and available reference materials (Community Plans, aerial photographs, land use designation and zoning) the site itself is obviously unsuitable to support significant, self-sustaining habitat for any significant species or serve as a suitable wildlife corridor. Areas to the west, south, and east are substantially developed and contain urban environments that cannot provide for adequate wildlife corridors; these areas are linked to the subject site, thus, it cannot be reasonably concluded that any wildlife corridor exists based on existing surrounding obstacles to wildlife movement to and from the subject site." "There are no federally protected fish or wildlife species on site. The project does not threaten to eliminate a plant or animal community, or reduce the number or restrict range of a rare or

---

[9] The last of these questions is a mandatory finding of significance under section 15065, subdivision (a)(1), of the Guidelines. Contrary to the respondents' argument, an impact need not satisfy the requirements of a mandatory finding of significance to be considered a significant impact.

endangered plant or animal. . . . The project site is surrounded by developed properties and cannot serve as a wildlife corridor or accommodate significant numbers of sensitive, endangered, or threatened wildlife species. The project will not impact areas containing significant ecological resources." The initial study did not refer to the 1989 biotic assessment or explain the inconsistencies between the biotic assessment and the initial study. The city did not obtain a current biotic assessment.

Several residents stated in administrative hearings or written comments that they had observed animal wildlife on the property site and expressed concerns that the project would adversely impact animal wildlife. One resident stated that he had observed a family of golden eagles nesting in a tree on the site. The Department of Fish and Game has designated the golden eagle a species of special concern.[10] Other residents referred to golden eagles, owls, hawks, crows, geese, egrets, California quail, and other resident or migratory birds, cottontail rabbits, coyotes, snakes, lizards, and other animals on the property. Mejia noted that the December 1989 biotic assessment had identified several animal species on the property and stated, "A current study should be conducted to determine whether these are candidates, sensitive, or special status species." Residents emphasized the rural character of the area and stated that some of the terrain surrounding the site is covered with vegetation supporting a wildlife corridor.

 The administrative record ordinarily is very limited when there is only an initial study and no EIR. Project opponents who challenge a negative declaration often have no expert studies to rely on. Recognizing this, courts have held that the absence of expert studies is not an obstacle because personal observations concerning nontechnical matters may constitute substantial evidence under CEQA. (*Arviv Enterprises, Inc. v. South Valley Area Planning Com., supra,* 101 Cal.App.4th at p. 1347; *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 882–883 [274 Cal.Rptr. 720].) This is particularly true where an expert assessment corroborates to some extent the personal observations, as here.

The mitigation measures set forth in the mitigated negative declaration as conditions of project approval were not designed to mitigate significant impacts on animal wildlife because the city did not acknowledge any

---

[10] See footnote 6, *ante.*

potentially significant impact on animal wildlife.[11] The two conditions modified by the advisory agency and the 10 conditions added by the Planning and Land Use Management Committee similarly were not designed to mitigate impacts on animal wildlife.

We conclude that the evidence supports a fair argument that the project may have a significant effect on animal wildlife. In light of the evidence discussed above and absent a current biotic assessment, the conclusions and explanations provided in the initial study do not preclude the reasonable possibility that birds, including species of special concern and others, may roost or nest on the property, that small mammals may use the property as a movement corridor, and that development of the site and elimination of the corridor may have a significant impact on animal wildlife. The proximity of larger wilderness areas does not necessarily compel the conclusion that the site is insignificant to animal wildlife. Contrary to the determinations of the initial study, we conclude that there is a fair argument that the project, in the words of the initial study checklist, may "[h]ave a substantial adverse effect . . . on . . . species identified as a candidate, sensitive, or special status species" or "interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors."

Our conclusion that a fair argument can be made that the project may have a significant impact on animal wildlife also compels the conclusion that the city was required to consult with the Department of Fish and Game, a trustee agency (Guidelines, § 15386), before conducting an initial study, and subsequently was required to notify the department of the city's intention to adopt a mitigated negative declaration. (Pub. Resources Code, § 21080.3, subd. (a); Guidelines, §§ 15063, subd. (g), 15072, subd. (a); *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1386–1388 [43 Cal.Rptr.2d 170].)

### 4. *A Fair Argument, Based on Substantial Evidence, Can Be Made That the Project May Have a Significant Impact on Traffic*

Several residents expressed concerns that the project would exacerbate traffic problems on Wheatland Avenue and increase the dangers for vehicle riders, equestrians, and pedestrians using the road. Residents characterized the community as a haven for equestrians who ride on trails and on

---

[11] Some of the conditions nonetheless may mitigate impacts on animal wildlife to some degree, such as the condition requiring the replacement of all "desirable trees" on the property. That condition does not expressly require the replacement of trees significant to native or migratory birds, however. Since the initial study concludes that the project will have no impact on animal wildlife even without mitigation, the "desirability" of trees to be replaced presumably may be determined by some measure other than the benefit to animal wildlife.

Wheatland Avenue. They stated that Wheatland Avenue has no sidewalks; that equestrians and pedestrians share the road with vehicles; that the road is particularly crowded on trash collection day and horse manure collection days (two different days) when refuse cans crowd the road; that vehicles have collided with horses on at least three recent occasions resulting in the horses having to be killed; and that the increased traffic caused by the additional homes would add to the problem.

A representative of the city Department of Transportation at an advisory agency public hearing in March 2002 acknowledged that Wheatland Avenue is a collector street designed to accommodate traffic from other streets, stating: "So we don't have a policy that studies a collector street being impacted, because a collector street is designed to handle additional traffic, and all the local streets are supposed to funnel into the collector street, and the collector street is supposed to take them to the major street, which is Sunland. In this case, it's actually what you have. You have the private streets from the development going to Wheatland Avenue, which is a collector, and the collector street goes down to Sunland, which is the major. So it does follow what it's designed to be.

"Now, there are other issues with Wheatland that maybe can be resolved, but it may take some winding or something, but many mentioned that it was too narrow or something. Maybe something can be done with that respect, but that has to be looked further into. But as far as significant impact caused by traffic, there's no significant impact caused by the number of trips generated by this particular development." The advisory agency stated at the conclusion of the hearing that it would ask the Department of Transportation "to take another look at the traffic generation from the 23-lot development." After the planning department prepared a new initial study and proposed mitigated negative declaration in September 2002 reducing the number of homes from 23 to 21, the advisory agency approved the project, apparently without further study of potential traffic impacts.

The initial study checklist prepared in September 2002 stated that there would be a less than significant impact in response to the question whether the project would "[c]ause an increase in traffic which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume to ratio capacity on roads, or congestion at intersections)." The explanation stated, "The Los Angeles Department of Transportation has established traffic impact thresholds based on the type and intensity of land use. The threshold for single-family home developments is 40 dwelling units or more; the project involves 23 [sic], low-density, single-family housing units on large lots. Therefore, the project does not meet the threshold criteria

for traffic impacts. Furthermore, the project will include street improvements and review by the Department of Transportation and the Bureau of Engineering." Similarly, the advisory agency at a public hearing before the planning commission in December 2002 explained, "The threshold for a traffic study in this case would be 40 dwelling units. This project does not meet that threshold."

■ A threshold of significance may be useful to determine whether an environmental impact normally should be considered significant. (Guidelines, § 15064.7, subd. (a).)[12] A threshold of significance is not conclusive, however, and does not relieve a public agency of the duty to consider the evidence under the fair argument standard. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108–1109 [11 Cal.Rptr.3d 104]; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110–114 [126 Cal.Rptr.2d 441]; see Guidelines, § 15064, subd. (b).[13]) A public agency cannot apply a threshold of significance or regulatory standard "in a way that forecloses the consideration of any other substantial evidence showing there may be a significant effect." (*Communities for a Better Environment, supra,* at p. 114.) We conclude that the city improperly relied on a threshold of significance despite substantial evidence supporting a fair argument that the project may have a significant impact on traffic on Wheatland Avenue. In light of the public comments and absent more careful consideration by city engineers and planners, the evidence supports a fair argument that the increased traffic on Wheatland Avenue as a result of the project would be substantial considering the uses of the road.

### 5. *Other Contentions*

In light of our determination that the evidence supports a fair argument that the project may have significant impacts on animal wildlife and traffic, an EIR is required. Accordingly, we need not address Mejia's other contentions challenging the mitigated negative declaration.

---

[12] "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will *normally* be determined to be significant by the agency and compliance with which means the effect *normally* will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a), italics added.)

[13] "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b).)

## *DISPOSITION*

The judgment is reversed with directions to the superior court to grant the petition and issue a peremptory writ of mandate ordering the city to vacate its approval of the project and mitigated negative declaration and to cause an EIR to be prepared. Mejia shall recover her costs on appeal.

Klein, P. J., and Aldrich, J., concurred.