Filed 6/23/26  ACE 4 Safe Trails v. Dept. of Parks and Recreation CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| ACE 4 SAFE TRAILS,<br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>DEPARTMENT OF PARKS AND<br>RECREATION,<br>　　　Defendant and Respondent. | C103129<br><br>(Super. Ct. No. 34-2023-80004086-CU-WM-GDS) |

This California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) case challenges the Department of Parks and Recreation's (the Department) approval of a road and trail management plan (the Plan) for Folsom Lake State Recreation Area and Folsom Powerhouse State Historic Park and a negative declaration finding the Plan would have no significant adverse impacts on the environment.  Plaintiff, ACE 4 Safe Trails (ACE) challenges the Department's approval of the Plan and the negative declaration on two grounds.  It argues that the so-called standard project requirements incorporated into certain projects recommended by the Plan are actually mitigation measures and should have been identified and treated as such.  It also argues the Department should have prepared an environmental impact report (EIR) because there is a fair argument that the Plan will have significant adverse impacts on public safety because it recommends allowing bikes to use certain trails that are

1

currently limited to pedestrians and equestrians.  We conclude the trial court properly denied ACE's challenge and thus affirm the judgment entered in favor of the Department.

## BACKGROUND

### I. *The Road and Trail Management Plan*

The Plan[1] provides "management direction for the road and trail systems" within Folsom Lake State Recreation Area and Folsom Powerhouse State Historic Park (collectively, the parks).  The parks, which comprise approximately 20,000 acres, are located in the Sierra Nevada foothills at the confluence of the North and South Forks of the American River and straddle El Dorado, Placer, and Sacramento Counties.  The Folsom Lake State Recreation Area is one of the most popular units in the state park system, with over 2.8 million visitors in the 2020-2021 fiscal year.  It contains more than 100 miles of unpaved trails and nearly 20 miles of paved trails.

The primary goal of the Plan "is to ensure that recreational trail opportunities are available at their fullest potential while protecting the parks' cultural and natural resources."  To effectuate this goal, the Plan "provides overarching recommendations that apply to the parks' entire trail system, such as the need to make all new trails and trail alterations accessible to the extent possible, remove or adopt all non-system trails [i.e., trails not recognized, designated, or maintained by the parks], maintain all trails to the [Department's] standard, improve partnerships with trail users, and initiate education programs for trail users on proper trail etiquette and trail safety as well as natural and cultural resources."  As relevant here, it also recommends clarifying, and in some cases changing, permissible uses on the parks' trails.  All trails in California state parks are open for pedestrian use and closed to all other uses, including bikes and horses, unless

---

[1]     We refer to the road and trail management plan as the Plan in an effort to keep acronyms to a minimum, but we note the parties and the underlying documents generally refer to it as the RTMP.

otherwise designated. "A 'multiuse trail' is one that allows two or more uses in addition to pedestrians. Thus, a bike trail, which by default allows for pedestrian use, is not considered multiuse, but a bike and horse trail is considered multiuse." The Plan includes recommendations to allow bikes to use approximately 20 miles of trails that are currently restricted to pedestrians and horses and to create new multiuse trails, and these recommendations are the focus of this lawsuit.

As the Plan explains, these change-in-use (or CIU) recommendations were made because surveys and focus groups "documented demand for additional biking trails, which generated formal CIU requests to add biking as an allowable use on [16] existing trails or trail segments" on which they are not currently allowed. The Plan recommends two of the change-in-use requests be approved without conditions, six be approved with conditions, and eight be denied. The two change-in-use requests where approval is recommended without conditions will require no physical modifications to the existing trails. For example, the Plan states that implementing the change-in-use for a short portion of the Pioneer Express Trail from San Juan Water to Beals Entrance will require "no trail modifications" "[o]ther than changing signing regarding the allowed uses on the trail." Similarly, the Plan states that implementing the change-in-use for the Snipes Pershing Ravine Trail will require "[n]o … physical modifications."

The six change-in-use requests where approval is recommended with conditions may require physical modifications to the existing trails, including rerouting, reconstructing, and realigning sections of the trails. For example, the Plan describes the change-in-use for the Pony Express Trail from Dike 6 to Dike 5 as follows: "This is a short, isolated segment of single-track trail, less than 1/4 mile in length. … The trail segment is ridden regularly by bikes. … The trail is on a gentle terrain with good sight distance, and trail safety and trail sustainability can be maintained with the CIU. However, the connection between this trail and Dike 6 needs improvement. Users (bikes) have made a steep shortcut up to this trail from the north end of Dike 6, which has

become a steep eroding chute.  This area should be addressed through a trail modification as part of implementing this CIU."  Similarly, the Plan recommends "a reroute of the southern end of the Los Lagos Trail to eliminate a steep, entrenched, and unsustainable section of trail" prior to implementing the change-in-use.  And to implement the change-in-use for the Strawberry Creek Trail, the Plan notes, "There are a few trail modifications needed to improve trail sustainability.  Maintenance brushing[2] can provide reasonable sight distance on this trail.  The district will further assess the need for signs, pinch points, or other measures to control speed."

The Plan states that further environmental review will be conducted before actually implementing any changes-in-use that require trail modifications.  It provides, "Most of the area-specific recommendations … will require additional project-specific planning and environmental review," and "any trail modifications required as a condition of any approved CIU will require project-specific environmental review."  Several of the descriptions of the specific change-in-use recommendations reiterate this.  For example, the recommendation regarding the Shady Trail change-in-use proposal notes, "Several trail modifications are needed to implement the CIU, including:  a reroute/reconstruction of the southern end of the trail to eliminate a deep gully with a blind turn and abrupt grade change as well as reconstruction of a rutted section of the trail and an adjacent causeway/drain lens to address draining and erosion problems. …  [¶]  … Site-specific analysis, including any required additional studies, will be conducted to evaluate the potential impacts of the proposed physical modifications of the trail on natural or cultural resources."  Similarly, the recommendation regarding the change-in-use for the Pioneer Express Trail from Truss Bridge to Folsom Crossing states:  "Regardless of the CIU, much of the trail needs reconstruction and realignment in order to be sustainable.  With

---

**2**      "Brushing" refers to the "[r]emoval of living and dead vegetation from a trail."

4

trail modifications, trail sustainability can be improved, and trail safety maintained for the proposed CIU.  As part of implementing the CIU, site-specific studies and evaluation would be conducted for the necessary physical modifications to the trail."  And the recommendation regarding the change-in-use for the Pioneer Express Trail from Truss Bridge to Snipes Pershing Outlet states:  "Further studies and evaluation … will be completed as part of the project-specific environmental review of the necessary CIU trail modifications."

As relevant here, the Plan also provides, "Standard project requirements outlined in the [Plan]'s environmental document [the initial study/negative declaration, discussed below] will be required … to minimize and avoid impacts to resources and ensure road and trail sustainability," and will be incorporated into change-in-use requests as applicable.

II.   *Environmental Review of the Plan — the Initial Study/Negative Declaration and the Change-in-use EIR*

The Department prepared an initial study/negative declaration to evaluate the Plan's potential environmental effects and explain its determination that the Plan will have no significant effects on the environment.  The initial study/negative declaration is "tiered" from a program-level EIR prepared by the Department in 2013 to analyze the environmental impacts of adopting a statewide road and trail change-in-use evaluation process, and the relevant portions of the change-in-use EIR are incorporated by reference into the initial study/negative declaration.[3]  We discuss the change-in-use EIR first, and then discuss the initial study/negative declaration for the Plan.

---

[3]   " 'Tiering' refers to using the analysis of general matters contained in a broader EIR … with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project."  (Cal. Code. Regs, tit. 14, § 15152, subd. (a).)  "Agencies are encouraged to tier the environmental analyses which they prepare for separate but related projects … .  This approach can

As explained in the change-in-use EIR, the change-in-use evaluation process "provides an objective and systematic approach for making decisions regarding" change-in-use proposals for trails in state parks and state recreation areas throughout California. The change-in-use EIR did not analyze specific change-in-use proposals because "the specific characteristics and locations of potential proposals are not known at this time." Instead, it analyzed "the full range of potential environmental effects of implementing the [change-in-use evaluation] Process."

One of the objectives of the change-in-use evaluation process is to "facilitate change-in-use proposals that would avoid significant effects on the environment through the incorporation of Standard Project Requirements … into the proposal description." Standard project requirements (SPRs) are "environmental protection measures related to trail design, construction, or management that are intended to maintain potential environmental effects at less-than-significant levels. SPRs that are applicable to a change-in-use proposal are incorporated into its description prior to environmental review. Compliance with the SPRs is one of the criteria that qualify a change-in-use proposal for approval under the proposed Process. The SPRs are considered to be part of the proposed change-in-use project, because they are related to standard trail design features and use management actions or generally required construction management

eliminate repetitive discussions of the same issues and focus the later EIR or negative declaration on the actual issues ripe for decision at each level of environmental review. Tiering is appropriate when the sequence of analysis is from an EIR prepared for a general plan, policy, or program to an EIR or negative declaration for another plan, policy, or program of lesser scope, or to a site-specific EIR or negative declaration." (Cal. Code. Regs., tit. 14, § 15152, subd. (b); see also *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373, 1383 ["Tiering is favored by the Legislature to streamline the regulatory process and avoid wasteful duplication of effort"].)

procedures." SPRs were developed to address numerous areas, including, as relevant here, natural resources, including plants and animals.[4]

The change-in-use EIR contains a lengthy discussion of the potential impacts on special-status plant and animal species that could result from changes-in-use. It notes, "Project actions that could result in removal or disturbance of special-status plant species include trail reconstruction or maintenance; rerouting of trail alignments; closure, decommissioning, and restoration of existing roads and trails to natural conditions; conversion of existing roads to trails; and construction of appurtenant facilities. Most ground disturbances resulting from the proposed Process would occur within existing disturbed road and trail prisms. Because ground disturbances would be limited mostly to these existing disturbed areas, potential impacts to suitable habitat for special-status plants would be very infrequent and are not expected. However, construction-related disturbances could occasionally occur in or otherwise affect areas that may support special-status plant populations outside of existing road and trail prisms. If special-status plants are present in those affected areas, construction activities could result in vegetation removal or trampling, deposition of dust or debris, soil compaction, or disturbance to root systems that could affect their survival." The EIR then explains that significant impacts to special-status plant species "would be avoided by compliance with SPRs for vegetation (BIO-13 through BIO-17). The SPRs include conducting preconstruction plant surveys, flagging, and fencing of areas to be protected to ensure complete avoidance of impacts." Similar findings are made regarding impacts on special-status animals.

The EIR also explains that the change-in-use evaluation process can only be used to implement relatively minor trail reroutes or realignments, and that major reroutes or

---

[4]  SPRs were also developed for general construction, cultural resources (general, historical, archeological), aesthetics, air quality, geology and soils, hazards, hydrology, traffic, and noise.

realignments will require further environmental review. It states, "The projects qualifying for approval under the proposed Process … could include rerouting of trail alignments to correct otherwise unsustainable road and trail conditions where realignment begins and ends at an existing trail, extends only as far as necessary to avoid the unsustainable condition, and causes no significant environmental effects. Some vegetation would be removed or disturbed to construct trail reroutes, depending on the location and necessary length of a reroute. However, reroutes would not be located within sensitive habitats or areas known to be occupied by special-status plant or wildlife species. All of the SPRs discussed for construction-related impacts to sensitive plant and wildlife resources (BIO 7 through BIO 38) would apply to trail reroutes and are intended to avoid significant long-term effects on biological resources. Additionally, any trail reroutes that occur are expected to be infrequent, short in length, and relatively minor." The EIR explains, "If removal or damage to special-status plants as a result of construction related to a change-in-use proposal cannot be avoided, the project would be disqualified from approval using the Process. If [the Department] elected to pursue the project further, it would require an independent, project-specific CEQA review."

The initial study/negative declaration for the Plan explains, "As part of the design process, the Department maintains a list of project requirements ('Standard Project Requirements' or 'SPRs') that are included in project design, as applicable, to reduce impacts to resources. SPRs are required elements of the design of any Department project intended to eliminate impacts to natural and cultural resources and are not considered mitigation measures. … For the [Plan], SPRs are drawn from those identified in the Statewide Program EIR from which this document tiers, that was prepared to consider the impacts from approval of the Road & Trail Change-in-Use process [i.e., the change-in-use EIR]." Similar to the change-in-use EIR, the initial study/negative declaration states, "When SPRs would not sufficiently minimize impacts to 'less than

8

significant levels,' a project will be analyzed in a Mitigated Negative Declaration or Environmental Impact Report."

The initial study/negative declaration notes that several special-status plant and animal species (including Pine Hill ceanothus, Sacramento Orcutt grass, the western pond turtle, the valley elderberry longhorn beetle, and the vernal pool fairy shrimp) "have the potential to occur" in the plant communities and wildlife habitats found in the parks, and trail projects, including rebuilding, reengineering, and rerouting trails, "have the potential to impact sensitive biological resources both directly (e.g., removal, injury, or death) and indirectly (e.g., habitat modification)." The initial study/negative declaration states, however, that integration of applicable SPRs into change-in-use projects would ensure that impacts to special-status plant and animal species would be less than significant.

Reading the initial study/negative declaration in conjunction with the change-in-use EIR, it appears that all applicable SPRs are incorporated into change-in-use projects at the outset and are considered part of the project. Moreover, if the project cannot be implemented without causing significant environmental impacts, then it cannot be approved under the change-in-use evaluation process, and the Department must conduct further CEQA review and prepare either a mitigated negative declaration or an EIR (and we note ACE does not suggest otherwise).

*III. The Lawsuit*

ACE represents trail users "who enjoy the simple peaceful pleasure of wandering down a trail, relaxing, de-stressing and enjoying nature," and it advocates for trail user safety in state parks. It filed a petition for writ of mandate challenging the Department's approval of the Plan and the initial study/negative declaration. It argued (1) SPRs are actually mitigation measures and should have been treated as such, and (2) an EIR should have been prepared because implementing the Plan's change-in-use recommendations may have significant adverse impacts on equestrian and pedestrian safety. The trial court

9

denied the petition, finding SPRs are design features rather than mitigation measures, and the potential safety impacts are social issues that are not subject to CEQA.

## DISCUSSION

### I. Standard of Review

"On an appeal challenging a trial court's denial of a petition for a writ of mandate in a CEQA case, our task is the same as the trial court's. [Citation.] We conduct our review of the agency's action independently of the trial court's findings." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 409.) We "review[] the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) "Thus, we conduct our own independent review and the conclusions of the superior court and its disposition of the issues … are not conclusive on appeal." (*Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 622.) Our task is to determine whether the agency committed "a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.)

### II. Relevant CEQA Principles

"A governmental agency must prepare an EIR on any project that may have a significant impact on the environment." (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 405.) "If there is no substantial evidence of any significant environmental impact, however, the agency may adopt a negative declaration." (*Ibid*.) "A negative declaration is proper only if the agency determines based on an initial study that there is no substantial evidence that the project may have a significant effect on the environment." (*Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 330-331.) "If an initial study shows that the project may have a significant effect on the environment, a

10

*mitigated* negative declaration may be appropriate … if project revisions would avoid or mitigate the potentially significant effects." (*Id*. at p. 331.)

In reviewing an agency's decision to adopt a negative declaration, the court "applies the 'fair argument' test. 'Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. …' If such evidence exists, the court must set aside the agency's decision to adopt a negative declaration as an abuse of discretion in failing to proceed in a manner as required by law." (*City of Redlands v. County of San Bernardino, supra*, 96 Cal.App.4th at p. 405, fns. omitted.) "Said another way, if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect." (*Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1345-1346.) "Whether the record contains sufficient evidence to support a fair argument is a question of law. [Citation.] Consequently, appellate courts independently review the record of proceedings and determine whether there is substantial evidence to support a fair argument that the proposed project may have a significant environmental impact." (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 207.)

III. *Standard Project Requirements are not Mitigation Measures*

ACE's first argument is that SPRs are actually mitigation measures and should have been treated as such by, for example, preparing a mitigated negative declaration rather than a negative declaration and adopting a mitigation monitoring plan. The Department argues SPRs are integral elements of all applicable change-in-use projects from the outset and are not mitigation measures. We agree with the Department.

"The distinction between elements of a project and measures designed to mitigate impacts of the project may not always be clear." (*Lotus v. Department of Transportation*

(2014) 223 Cal.App.4th 645, 656, fn. 8.)  However, case law, CEQA, and the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) (hereafter Guidelines) teach that mitigation measures generally involve changes or revisions made to a project as originally designed or proposed in order to reduce its environmental impacts.  Viewed this way, SPRs are not mitigation measures because they do not involve changes or revisions made to change-in-use projects as originally designed; instead, they are an integral part of every change-in-use project from the outset.

In *Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863, for example, the court noted, "A mitigation measure … involves 'feasible *changes* in any or all activities involved in the project in order to substantially lessen or avoid significant effects on the environment … .' " (*Id.* at p. 882, italics added.) The court thus held something that "was always an integral part" of a project is "not a mitigation measure in any sense of that word." (*Ibid*.)  *Save the Plastic Bag Coalition* involved a challenge to a city ordinance that banned single-use plastic bags and imposed a mandatory 10-cent charge on paper bags and compostable plastic bags.  (*Id*. at p. 871.) The challengers argued the 10-cent charge was a mitigation measure, but the court disagreed, noting the 10-cent charge was a part of the project design from its inception and "was not a 'mitigation measure' to try to alleviate some perceived difficulties in the original plan." (*Id*. at p. 883.)  It explained that, in contrast to something that is a part of the project design from the outset, a mitigation measure is something that involves "*subsequent actions* by the project's proponent to mitigate or offset the alleged adverse environmental impacts" of the project as originally designed or proposed.  (*Id*. at pp. 882-883, italics added.)

*Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329 is similar.  There, the trial court denied a petition for a writ of mandate to block an affordable housing development in Berkeley and the appellate court affirmed.  (*Id*. at pp. 1338, 1347-1354.)

One aspect of the project was that the developer "would dedicate land for a left turn lane on Ashby Avenue, thereby reducing traffic impacts to less than significant." (*Id*. at p. 1352.) The court rejected the plaintiff's contention that the dedication was a mitigation measure, and found it was instead "a component of the project that assisted the City with an existing traffic issue." (*Ibid*.) It reasoned that the traffic problem preexisted the proposed project and the dedication that improved that problem "became *part* of the project design — it was never a *proposed* mitigation measure." (*Id*. at p. 1353.) The court also noted it was aware of "no authority for the proposition that a positive effort between developers and a municipality to improve the project for the benefit of the community and address existing traffic concerns somehow becomes an evasion of CEQA." (*Ibid*.)

These two cases thus teach that something that is part of a project from the outset is not a mitigation measure. The Guidelines support this conclusion. They provide that "a mitigated negative declaration shall be prepared" when "there is substantial evidence in the record that the project may have a significant effect on the environment but … *revisions in the project plans or proposals* … would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur and there is no substantial evidence in light of the whole record before the public agency that the project, *as revised*, may have a significant effect on the environment." (Guidelines, § 15064, subd. (f)(2), italics added; see also *Mejia v. City of Los Angeles, supra*, 130 Cal.App.4th at p. 331 ["A mitigated negative declaration is proper … if *project revisions* would avoid or mitigate the potentially significant effects" (italics added)].) The Guidelines thus teach that mitigation measures are *revisions* to a project as designed or proposed that would avoid the project's significant adverse effects. If the project is designed in a way that avoids any significant effect on the environment, however, then mitigated measures are not needed and a mitigated negative declaration is not required.

So defined, the SPRs are not revisions to change-in-use projects; instead, they are integral and automatic parts of any change-in-use project from the outset. As noted above, the initial study/negative declaration states, "SPRs are required elements of the design of any Department project intended to eliminate impacts to natural and cultural resources and are not considered mitigation measures." And the change-in-use EIR states, "SPRs that are applicable to a change-in-use proposal are incorporated into its description prior to environmental review" and "are considered to be part of the proposed change-in-use project, because they are related to standard trail design features and use management actions or generally required construction management procedures." Although ACE complains the Department is (mis)using SPRs in order to avoid disclosing or discussing potentially significant environmental impacts, we are aware of no authority for the proposition that the Department's proactive incorporation of environmentally protective features into change-of-use proposals somehow becomes an evasion of CEQA.

We find *Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555 instructive. That case involved the approval of an application to hold a two-day rodeo at a county fairground. (*Id*. at pp. 561-562.) Six months before the rodeo application was submitted, the fairground adopted a manure management plan, or MMP, to manage manure produced during equestrian and livestock events in order to ensure fecal material was not discharged into nearby streams. (*Id*. at pp. 562-563.) The MMP required things like removal of manure and bedding to a cement slab immediately after each event; hauling the manure away at the end of the event or when close to capacity; tilling the soil to promote filtration of rainwater; and planting vegetation to prevent erosion and promote filtration of surface contaminants. (*Id*. at p. 563.) The fairground found that, with implementation of the MMP, "no significant [environmental] impacts are anticipated," and it approved the application. (*Id*. at p. 565.) One of the issues in the case was whether the MMP was a mitigation measure. The court held it was not, because it was "not a new measure proposed for or necessitated by the

14

rodeo project.  Rather, it is a preexisting measure previously implemented to address a preexisting concern, which was formalized in writing before the rodeo project was proposed." (*Id*. at p. 569.)  "The critical point is that the MMP preexisted … this rodeo project and was directed toward a preexisting concern.  It was not proposed for or created by this rodeo project." (*Id*. at p. 572.)

We find the SPRs are analogous to the MMP in *Citizens for Environmental Responsibility*.  They were implemented in 2013 as part of the change-in-use EIR and evaluation process, and, as stated in the change-in-use EIR, all applicable SPRs must be incorporated into the description of change-in-use proposals at the outset in order to protect natural resources and prevent significant environmental impacts that could occur when a particular change-in-use requires physical modifications to a trail.  To paraphrase *Citizens for Environmental Responsibility*, "[t]he critical point is that the [SPRs] preexisted [the Plan and its change-in-use recommendations] and [were] directed toward a preexisting concern [i.e., ensuring trail modifications necessitated by changes-in-use did not significantly impact the environment].  [SPRs were] not proposed for or created by [the Plan or its change-in-use recommendations]." (*Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn., supra*, 242 Cal.App.4th at p. 572.)

*Berkeley Hillside Preservation v. City of Berkeley* (2015) 241 Cal.App.4th 943 is also instructive.  There, the city approved a permit to build a large single-family home (the home and attached garage were over 10,000 square feet) in the Berkeley Hills (*id*. at p. 947), and "imposed various 'standard conditions' on the proposed construction, including requiring the permit applicant to secure a construction traffic-management plan" (*id*. at p. 948).  A group of residents filed a CEQA lawsuit challenging the approval, and one of their arguments was that the traffic management plan was a mitigation measure.  (*Id*. at pp. 951, 958.)  The appellate court disagreed, noting the traffic management plan was a condition imposed under the Berkeley Municipal Code and was one of the " 'standard conditions imposed on residential development in the

15

Hills' " and was " 'not intended to address any specific environmental impacts resulting from the construction of this project.' " (*Berkeley Hillside Preservation*, at p. 959.) It thus held the traffic management plan "is not proposed subsequent action taken to mitigate any significant effect of the project, and therefore is not a mitigation measure that precludes the application of a categorical exemption." (*Id*. at p. 961.) The Department's SPRs are akin to the standard conditions imposed on residential development in the *Berkeley Hillside Preservation* case. They were implemented and required in 2013, are automatically applied to all change-in-use projects, are not "subsequent action[s] taken to mitigate any significant effect of the project[s recommended by the Plan], and therefore [are] not mitigation measures." (*Ibid*.)

IV. *The Potential Safety Impacts Stemming from Changes-in-use are not Subject to CEQA*

ACE argues substantial evidence supports a fair argument that converting trails to multiuse and thus allowing bikes to use trails that were previously limited to hikers and/or equestrians may have significant adverse impacts on public safety, thus requiring the preparation of an EIR. According to ACE, "Mountain bikers not only use the trails in different ways but use them at different speeds and intensity. Hiking and equestrian use is predominately leisurely, contemplative and pastoral as opposed to mountain biking which is about strength, endurance, challenges and tests of skill, as well as thrill seeking and high speeds." It contends fast moving mountain bikers are "incompatible" with slow moving hikers and equestrians, and multiuse trails thus "create[] significant public safety issues." The Department argues the safety impacts identified by ACE are social impacts rather than environmental impacts, and are thus beyond the purview of CEQA. We agree with the Department.[5]

---

[5] The parties dispute whether the evidence cited by ACE (primarily lay testimony from trail users based on personal observation) is sufficient to support a fair argument

16

CEQA is concerned with a project's physical impacts on the environment, not with a project's social impacts on people. Case law teaches that " 'CEQA addresses physical changes in the environment, and under CEQA "economic and social changes resulting from a project shall not be treated as significant effects on the environment." ' [Citations.] 'Economic and social changes resulting from a project are not treated as significant environmental effects [citation] and, thus, need not be mitigated or avoided under CEQA.' [Citation.] 'The focus of the analysis shall be on the physical changes.' " (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 575.)

CEQA provides an EIR must be prepared "[i]f there is substantial evidence … that the project may have a significant effect on the environment" (Pub. Resources Code, § 21080, subd. (d)), and it defines a " '[s]ignificant effect on the environment' " as "a substantial, or potentially substantial, adverse change in the environment" (Pub. Resources Code, § 21068). The term " '[e]nvironment,' " in turn, is defined as "the *physical conditions which exist within the area* which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5, italics added.) Accordingly, a significant effect on the environment means a substantial or potentially substantial adverse change in the physical conditions that exist within the project's area. (See Guidelines, § 15382.)

The Guidelines reinforce that CEQA's focus is on physical changes to the environment. They provide, "Effects analyzed under CEQA must be related to a physical change." (Guidelines, § 15358, subd. (b).) They also provide, "Evidence of economic and social impacts that do not contribute to or are not caused by physical changes in the environment is not substantial evidence that the project may have a significant effect on

---

that changes-in-use create safety issues for pedestrians and equestrians. Because we agree the Department was not required to consider the safety impacts identified by ACE, we need not resolve this dispute.

the environment." (Guidelines, § 15064, subd. (f)(6).) And, "An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Guidelines, § 15382.)

In this case, the safety issues about which ACE complains are not caused by physical changes in the environment; they are caused by the Department's decision to allow bikers to use trails that were previously limited to hikers and equestrians. The lack of any relation to a physical change is easiest to see with the two change-in-use proposals the Plan recommends be approved without conditions. No physical modifications or changes to the existing trail are required in order to implement the change-in-use.[6] Thus, even if we assume these two changes-in-use could adversely impact the safety of hikers and equestrians, that adverse impact would not be related to or caused by a physical change to the environment, because there will be no physical change to the environment. Simply put, the trails will remain the same.

Even with the six change-in-use proposals that the Plan recommends be approved with conditions, the adverse safety impacts about which ACE complains would not be caused by or related to any physical changes to the environment. For example, the Plan states "trail modifications" will be required in order to implement the Shady Trail change-in-use proposal, including "a reroute/reconstruction of the southern end of the trail to eliminate a deep gully with a blind turn and abrupt grade change as well as reconstruction of a rutted section of trail and an adjacent causeway/drain lens to address drainage and erosion problems." Although this particular change-in-use could cause a

---

[6] Signs may need to be changed regarding the new permissible uses, but ACE does not suggest that changing signs is a significant adverse effect on the environment, and in any event we note that adding "[n]ew copy on existing … signs" is categorically exempt from CEQA. (Guidelines, § 15301, subd. (g).)

physical change in the environment (i.e., by reconstructing or rerouting portions of the trail), it is not the physical change in the environment that would cause the safety issues about which ACE complains; it is the decision to allow bikes to use the trail and the concomitant possibility that they may do so in an unsafe manner.

ACE cites *City of Maywood v. Los Angeles Unified School District* (2012) 208 Cal.App.4th 362 for the proposition that "CEQA has long recognized that an environmental document must address a project's potential impacts to pedestrian safety," and it argues pedestrian safety is analogous to hiker and equestrian safety. *City of Maywood* is distinguishable because the impacts to pedestrian safety in that case, unlike in this case, were caused by the project's physical changes to the environment.

*City of Maywood* involved a challenge to an EIR that analyzed the environmental impacts of building a new high school. (*City of Maywood v. Los Angeles Unified School District, supra*, 208 Cal.App.4th at p. 370.) The high school would be constructed on two city blocks that were bisected by an active roadway (58th Street) that would divide the campus. (*Id*. at pp. 371-372, 387.) One side of the campus would contain classrooms and other buildings, the other side of the campus would contain sports facilities and a parking garage, and the two sides would be connected by a pedestrian bridge. (*Id*. at pp. 371-372.) The draft EIR discussed the project's potential impacts on pedestrian safety, but "did not discuss whether students and staff would be endangered by the fact that 58th Street bisected the project site or whether the proposed pedestrian bridge would adequately mitigate any such hazards." (*Id*. at p. 376.) During the public comment period, the city raised " 'serious safety concerns about the design of the campus with a busy truck-laden street running down the middle and no effective way to prevent teens from jaywalking.' " (*Id*. at pp. 377-378.) In response to these comments, the school district noted students would be required to use the pedestrian bridge and would be prohibited from crossing 58th Street at street level. (*Id*. at p. 378.) The school district ultimately certified the EIR and approved the project, and the city filed a lawsuit

19

challenging the approval, arguing the EIR failed to sufficiently address the risks to pedestrians associated with a street bisecting the campus. The trial court agreed, and the appellate court affirmed. (*Id*. at pp. 371, 383-384.)

The court began by noting one of the questions it had to decide was whether the school district had "a duty to investigate whether the presence of an active roadway traversed by a pedestrian bridge presented potential impacts to pedestrian safety." (*City of Maywood v. Los Angeles Unified School District, supra*, 208 Cal.App.4th at p. 390.) As to that question, the court noted the school district "*concede*[*d*] that it had a duty to consider whether the design of the project, which leaves 58th Street as an active roadway traversable by a pedestrian bridge, presented significant impacts to pedestrian safety. The FEIR states that [the school district's] criteria applicable to new school project sites require an EIR to evaluate whether the project 'substantially increase[s] … pedestrian safety hazards due to a design feature.' " (*Ibid*., italics added.) The court thus spent little time discussing the question other than to note the school district's "concession is well taken" (*ibid*.), because CEQA required it to consider any " 'substantial or potentially substantial adverse change in the physical conditions existing within the area affected by the project,' " and thus required it "to consider whether the design features of its project — including the presence of an active roadway running through the middle of the project site and the incorporation of a pedestrian bridge — created risks to pedestrians in and around the project site" (*id*. at p. 391). In other words, building a high school would change the physical conditions existing in the area, and if the design of the high school created risks to pedestrian safety, the district had to consider those risks.

Here, in contrast, the alleged safety risks are not caused or created by any physical changes to the parks' trails; instead, they are caused or created by the decision to allow bikes to use those trails. Those safety risks are thus not the types of impacts that must be analyzed under CEQA.

## DISPOSITION

The judgment is affirmed, and the Department shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

/s/
EARL, P. J.

We concur:

/s/
DUARTE, J.*

/s/
WISEMAN, J.†

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

† Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.